BRIAN G. NICHOLS, Plaintiff-Appellant, v. CHICAGO TRANSIT AUTHORITY HARDSHIP COMMITTEE, Defendant-Appellee.

First District (2nd Division)   No. 1—02—0210

Opinion filed February 25, 2003.—Rehearing denied June 10, 2003.

Brian G. Nichols, appellant *pro se*.

Richard W. Burke and Stephen R. Meinertzhagen, both of Burke, Warren, MacKay & Serritella, P.C., of Chicago, for appellee.

PRESIDING JUSTICE McBRIDE delivered the opinion of the court:

Plaintiff Brian G. Nichols, a Chicago Transit Authority (CTA) employee, requested a withdrawal of his funds from the CTA Employees' Deferred Compensation Plan (Plan). Nichols' applications were denied by the committee (Committee) that administers the Plan

and he appealed to the circuit court. The circuit court found that the Committee did not abuse its discretion in denying Nichols' request for funds. Nichols appeals to this court, *pro se*, contending that the Committee erred in failing to acknowledge his status as an eligible participant for the Plan's emergency hardship withdrawal.

At the time of the hearing, Nichols had been employed as a bus operator with the CTA for over 20 years. He participated in the Plan from 1987 or 1988 through January 1999. Nichols testified that in addition to his employment with the CTA, he held a second job with the Beverly Bus Federal Credit Union as an assistant treasurer. Nichols held this job with the credit union starting in 1990. He was not rehired by the credit union in March of 1999. Nichols testified that his termination by the credit union caught him by surprise as he expected to be employed with it until he eventually became the treasurer. At the time his employment from the credit union was terminated, Nichols' monthly net salary with the credit union was approximately $1,100.

Nichols' first application to withdraw funds from the Plan was February 17, 1999. Nichols characterized the loss of his second job with the credit union as an "unforeseeable emergency." This application was denied by the Committee on February 24, 1999. The Committee noted that "[n]o specific event which was extraordinary, unforeseeable and beyond the control of the Participant was identified." Nichols appealed the denial of his application. On March 30, 1999, his appeal to the Committee was denied on the basis that his application failed to identify a "correct hardship reason." Nichols made additional application for distribution of funds on June 23, 1999, and August 24, 1999. Both additional applications were subsequently denied.

The CTA's Employees' Deferred Compensation Plan is intended to qualify as an eligible "State Deferred Compensation Plan" under section 457(b) of the Internal Revenue Code of 1986. 26 U.S.C. § 457(b) (2000). The purpose of the Plan is to provide an optional benefit to CTA employees whereby a designated amount of the participant's compensation is withheld each month by the employer and placed into a trust. The employee may withdraw funds from the Plan in the event of an "unforeseeable emergency." Under section 5.12 of the Plan:

> "a distribution of Deferred Compensation credited to a Participant's account shall be permitted in the event the Participant experiences an unforeseeable emergency, determined in the sole discretion of the Committee, creating severe financial hardship as a result of sudden and unexpected illness or accident of the Participant or of a dependent of the Participant (as defined in Section 152(a) of the Code), loss of the Participant's property due to casualty, or other

similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the Participant. Payment may not be made to the extent that such hardship is or may be relieved: (1) through reimbursement or compensation by insurance or otherwise; (2) by liquidation of the Participant's assets to the extent the liquidation of those assets would not itself cause severe financial hardship; or (3) by cessation of deferrals under the Plan. The need to send a child to college or the desire to purchase a new home shall not be considered unforeseeable emergencies. All distributions under this subparagraph shall be in a lump sum and shall be permitted only to the extent reasonably needed to satisfy the emergency need, taking into account the amount of any income tax withholding or other income tax liability resulting from the distribution. Application for distributions under this subparagraph must be approved by the Committee. The Committee shall have authority to require such evidence as it may need to determine whether a Participant is experiencing an unforeseeable emergency."

■ Under the Administrative Review Law, we review the final decision of the administrative agency and not the decision of the circuit court. 735 ILCS 5/3—101 *et seq.* (West 2000). When deciding a mixed question of law and fact, we review the agency's decision under a clearly erroneous standard. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205, 692 N.E.2d 295 (1998). As articulated by the Illinois Supreme Court: "because this case involves an examination of the legal effect of a given set of facts, it involves a mixed question of fact and law. Given the mixed nature of the [Committee's] decision, we find that the applicable standard of review should be between a manifest weight of the evidence standard and a *de novo* standard so as to provide some deference to the [Committee's] experience and expertise. We therefore hold that a clearly erroneous standard of review is appropriate to examine the [Committee's] decision." *City of Belvidere*, 181 Ill. 2d at 205.

■ It is undisputed that Nichols' alleged severe financial hardship was not the result of a sudden and unexpected illness or accident of Nichols or of a dependent, or loss of his property due to casualty. Nichols argues that his severe financial hardship due to the loss of his second job with the Beverly Bus Federal Credit Union falls under the category of "other similar extraordinary and unforeseeable circumstances arising as a result of events beyond [his] control." The Plan specifically states that sending a child to college or buying a new home is not an expense that qualifies as an "unforeseeable emergenc[y]." Except for these two specific examples, the Plan does not delineate what would or would not qualify as "unforeseeable emergencies." Likewise, the Plan does not provide examples of "other similar

832

extraordinary and unforeseeable circumstances." *Schmitt v. Review Committee (The Copeland Cos.)*, 179 A.D.2d 959, 960, 579 N.Y.S.2d 217, 218 (1992), noted that by operation of the rule of *ejusdem generis*, the language of " 'other similar extraordinary and unforeseeable circumstances' is limited in its effect by the specific examples preceding it."

■ The Plan does state that the distribution of funds from the participant's account is determined in the sole discretion of the Committee. Courts have noted that the language "sole discretion" does not command complete judicial deference. *Cutting v. Jerome Foods, Inc.*, 993 F.2d 1293, 1296 (7th Cir. 1993). However, it has been held that the language "sole discretion" is an "unambiguous vesting of discretion" requiring the rejection of the contention that the language is "uncertain and ambiguous." *Quinn v. Non-Contributory National Long Term Disability Program*, 113 F. Supp. 2d 1216, 1221 (N.D. Ill. 2000). See also *Gatto v. St. Richard School, Inc.*, 774 N.E.2d 914 (Ind. App. 2002); *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 177 F. Supp. 2d 803 (N.D. Ill. 2001). While we do not give the Committee unfettered discretion on appellate review, we do appreciate the importance of the Plan's meaning and intent. We find that discretion is vested in the Committee to make determinations for distribution under the Plan, and we review the Committee's decision with an eye toward deference to its unique experience.

When Nichols' application for distribution was denied on March 30, 1999, the Committee stated that "the determination was that there is no correct hardship reason identified." When his application was denied on June 30, 1999, the Committee's reason was that "no specific event which was extraordinary, unforeseeable and beyond the control of the participant was identified." On September 29, 1999, Nichols' application was denied for the same reason as noted on the June 30, 1999, letter from the Committee.

At the hearing, Nichols testified that from 1990 to 1999 he was reappointed each year as the assistant treasurer of the credit union. In 1999, the treasurer of the credit union did not reappoint Nichols as the assistant treasurer. Nichols argues in his brief that there was nothing to indicate that his second job with the credit union was "threatened, or even remotely, expected to be eliminated, and it was an unforeseen event." He argues he was not concerned about his job security with the credit union because he was the only professional person with the organization.[1] Nichols believed his job was secure with the credit union because the treasurer of the credit union was a

[1]Plaintiff states in his brief that he has a degree in accounting.

close friend and Nichols was assured by the treasurer that he (Nichols) would be the next treasurer of the organization upon his friend's retirement. Nichols contends that, under these circumstances, the loss of this second job was "unforeseeable." In its brief, the CTA contends that the loss of a second job is not an unforeseeable emergency for purposes of the Plan because "it is neither something that a reasonable person would find extraordinary, nor something that is so unusual that it cannot be foreseen." In its September 23, 1999, denial of Nichols' application, the Committee noted: "second job is contractual with option of replacement every year. Not unforeseeable." We agree with the Committee. By his own testimony, Nichols stated that his position with the credit union was contractual in the sense that he had to be reappointed each year in order to maintain his position. Despite the fact that Nichols was reappointed as assistant treasurer by his friend each year for nine years, it was foreseeable that a year would come where Nichols would not be reappointed. We do not find under the circumstances presented in this case that the loss of Nichols' second job would qualify as an "extraordinary and unforeseeable circumstance" under the Plan.

Nichols testified that he suffered from severe financial hardship due to the loss of his second job. At the time of trial—October 16, 2001—Nichols stated that his home was in foreclosure due to nonpayment of the mortgage, his automobile was in the process of being repossessed because his payment was three months in arrears, he was "subject to" a wage garnishment because of a nonpayment of debt owed to the credit union, and his credit was "destroyed" due to late or no payments on credit cards. He also testified that his home was in a state of disrepair and in need of new windows. The amount of Nichols' indebtedness, exclusive of his home, at the time of trial was estimated by Nichols to be $50,000. On cross-examination, Nichols testified that at the time he filed his first application for withdrawal of funds from the Plan, his monthly mortgage payment was $580 and his monthly automobile payment was $535. He also testified that his annual salary with the CTA was approximately $40,000. Significantly, Nichols testified that in February of 2001, he began working a new second job with Federal Express. He testified that he netted approximately $900 a month from this new second job—approximately $200 less than what he was making with the credit union. See *Shorter v. Leach*, 277 N.J. Super. 617, 650 A.2d 16 (1994) (automobile accident victim's claim of economic loss did not raise issue necessary to demonstrate that she suffered a "serious impact" on her lifestyle).

The Plan states that payment of funds will not be made if the hardship may be relieved through "reimbursement or compensation

by insurance or otherwise." The Plan also provides that payments may not be made to the extent that the hardship is or may be relieved "by liquidation of the Participant's assets to the extent the liquidation of those assets would not itself cause severe financial hardship." By his own testimony, Nichols has made significant efforts to relieve his hardship by seeking and obtaining a new second job. While we acknowledge that a period of time elapsed between the loss of his employment with the credit union and his employment with Federal Express, we cannot ignore that Nichols' "severe financial hardship" was being relieved through a new avenue of compensation. Additionally, the Plan suggests that withdrawals may not be allowed where liquidation of assets may relieve the hardship. At the hearing, Nichols testified to potential assets in the form of a house and automobile.

■ Both parties stated at the hearing and in their briefs that the courts have not provided any guidance as to whether the loss of a second job should be considered an unforeseeable emergency. Our research has proven equally fruitless. We do find some guidance from the New York appellate court. In *Schmitt v. Review Committee (The Copeland Cos.)*, Schmitt requested a withdrawal of funds from his employer's deferred compensation fund. He alleged an "unforeseeable emergency" due to his delinquent federal income taxes for 1987, 1988 and 1989. Schmitt's employer denied his request based on a determination that his circumstances did not qualify as an "unforeseen financial hardship" under Internal Revenue Code section 457. The New York trial court found that financial mismanagement could be considered an unforeseeable emergency and granted judgment in favor of Schmitt. The employer then appealed to the New York appellate court. *Schmitt*, 179 A.D.2d at 959, 579 N.Y.S.2d at 218. In its opinion, the appellate court noted that, under the IRS statute, an unforeseeable emergency "require[s] a showing of 'severe financial hardship' resulting from a 'sudden and unexpected illness or accident', property loss due to casualty or 'other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the participant.' " *Schmitt*, 179 A.D.2d at 960, 579 N.Y.S.2d at 218, quoting 26 C.F.R. § 1.457—2(h)(4) (1992). Under the language provided by the statute, the appellate court found that delinquent federal income taxes did not justify a premature withdrawal of Schmitt's investment. The court stated: "[T]he language must be confined to matters such as unexpected illnesses, accidents or other extraordinary circumstances and cannot be construed so broadly as to include unanticipated financial shortages as the result of poor money management." *Schmitt*, 179 A.D.2d at 960, 579 N.Y.S.2d at 218. Moreover, the court held that its review was "limited to ensuring that [the employer's] determina-

tion was neither irrational nor unreasonable." *Schmitt,* 179 A.D.2d at 960, 579 N.Y.S.2d at 218.

We find under the circumstances presented at the hearing that Nichols' loss of his second job with the Beverly Bus Federal Credit Union was not an unforeseeable emergency. We cannot say that the Committee was clearly erroneous in its decision to deny Nichols a withdrawal of funds. Therefore, we agree with the decision of the CTA's unforeseeable emergency committee under the deferred compensation plan and affirm the decision of the trial court.

Affirmed.

CAHILL and BURKE, JJ., concur.